UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                :
GLOBAL NETWORK COMMUNICATIONS, INC.,   :
                :
        Plaintiff,   :      07 Civ. _____
                :
- against -   :
                :      **COMPLAINT**
CITY OF NEW YORK and CITY OF NEW YORK   :
DEPARTMENT OF INFORMATION   :
TECHNOLOGY AND TELECOMMUNICATIONS,   :
                :
        Defendants.   :
------------------------------------------------------------------------X

Plaintiff, Global Network Communications, Inc. ("Global"), by its attorneys, Law Office of Joseph P. Garland, for its Complaint against Defendants City of New York (the "City") and the City of New York Department of Information Technology and Telecommunications ("DoITT") (jointly "Defendants") alleges as follows:

### INTRODUCTION/LEGISLATIVE SCHEME

1. This case concerns Defendants' erection of barriers to entry and exit for actual and potential participants in the provision of telecommunications services on the public rights-of-way in the City. Those participants are the operators of public pay telephones ("PPTs") that are on the sidewalks of the streets of the City, which are owned by the City in trust for its citizens.

2. Under the Telecommunications Act of 1996 (the "Telecom Act"), which is part of the Federal Communications Act, municipalities such as the City are restricted in what they can do insofar as they affect the provision of a telecommunications service. Specifically, section 253 of the Telecom Act, 47 U.S.C. § 253, recognizes that telecommunications services are widely offered on the property of municipalities and that municipalities are therefore in a particularly

powerful position as arbiters of how PPT services are offered to the public and, equally important, by whom. It also recognized the long-time position that incumbent telephone companies (generally erstwhile operating subsidies of AT&T) as entrenched and dominant providers of PPT services.

      3. In addition, pursuant to section 276 of the Telecom Act, which expressly is concerned with public pay telephones, the Federal Communications Commission has adopted regulations that require states and their subdivisions, such as the City, to remove all barriers to entry and exit in the public pay telephone business. Defendants' failure to allow third-parties obtain a franchise for the operation of PPTs on the public rights-of-way, which has continued for over five years, is in direct violation of the FCC's regulations and constitutes a barrier to Global's ability to exit the market for the provision of such telecommunications services.

      4. Section 253, entitled "Removal of barriers to entry," accordingly provides that

> No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.

47 U.S.C. § 253(a).

      5. Section 253 also reserves *to states* the right "to impose, on a competitively neutral basis and consistent with section 254 of this title, requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers." 47 U.S.C. § 253(b).

      6. The City, through DoITT, has erected a scheme for the granting of franchises to PPT-operators and potential PPT-operators that is inappropriate given the limited role ceded to local governments by section 253. This Action, however, concerns not the subtle discrimination of the City's franchise requirements but Defendants' violation of the prohibition set forth in the Tele-

com Act and the regulations promulgated pursuant thereto to the maintenance and erection of barriers to entry and exit into a telecommunications business, in this case the operation of PPTs.

## PARTIES AND VENUE

7. Plaintiff Global is a corporation organized under the laws of the State of New York, whose principal place of business is 1080 Leggett Avenue, Bronx NY 10461. Global provides telephone and telecommunications services to the public, particularly through its operation of PPTs.

8. Defendant City of New York is a municipal corporation organized and existing pursuant to the laws of the State of New York and is a political subdivision of the State of New York.

9. Defendant DoITT is a department of Defendant City of New York whose address is 75 Park Place, New York, NY 10007.

10. Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

## SUBJECT MATTER JURISDICTION

11. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because of the existence of a federal question arising under the Communications Act of 1934, as amended, including the amendments made by the Telecom Act, 47 U.S.C. §§ 253 and 276.

## FACTS

### Global's Provision Of Public Pay Telephone Service

12. Global provides telephone and telecommunications services via public pay telephones ("PPTs").

13. Global owns approximately _____ PPTs located on or near New York City sidewalks, and has been lawfully operating its business since 1990. Approximately _____ of Global's

PPTs were installed before March 1, 1996.

14. Global has entered into an agreement with Jeffrey Hanft pursuant to which Hanft agrees that a private company formed by and controlled by him would acquire all of Global's PPTs within the City of New York (the "Global PPTs") and Global agrees to sell those assets to that company.

15. To ensure that it can operate those of the PPTs that are located on the public rights-of-way in the City legally, Hanft has sought to obtain a franchise from the City. Hanft's acquisition of the Global PPTs is contingent upon his being able to operate them on the public rights-of-way in the City, for which he need to obtain a franchise from Defendants.

16. Hanft has provided all the information sought of him with respect to his application for a franchise, including the completion of the City's Vendor Information Exchange System ("VENDEX") application and a personal interview with the Department of Investigation of the City.

17. Hanft, through counsel, has requested a report from the City as to what the status of his application is. The City responded by saying that the assets that would be bought – Global's PPTs – "no longer constitute transferable assets of Global." (Regal letter, Dec. 11, 2007.)

18. Hanft has sought to meet with the City to discuss any further issues that are preventing his entry into the business of operating PPTs on the public rights-of-way in the City. The City has refused to meet with Hanft.

19. The City has advised Global that Global PPTs on the City's public rights-of-way are being operated without permits because of the absence of a franchise issued to Global. The City has further advised Global that it will remove Global PPTs on the City's public rights-of-way.

20. Global was denied a franchise for reasons unrelated to Global PPTs on the City's

public rights-of-way.

21. Accordingly, Global has attempted to sell its PPTs on the City's public rights-of-way to a third-party who would be able to operate those PPTs pursuant to a franchise offered by the City.

22. A firm interested in entering the market for operating PPTs on the City's public rights-of-way must obtain a franchise to do so.  Other than acquiring a company that currently has a franchise, however, there is no mechanism in place for obtaining such a franchise.

### The City's Payphone Franchising Process – Resolution 1043

23. Pursuant to Sections 363 and 1072 of the City Charter, the City Council on August 17, 1995 passed resolution number 439-A, authorizing DoITT to enter into franchise agreements for the operation of PPTs and directing DoITT to issue a request for proposals for public pay telephone franchises.  On March 25, 1997, the City Council issued a second authorizing resolution, number 2248, which revised Resolution No. 439-A.  That authorization expired five years later, on March 25, 2002, although in fact DoITT only accepted applications for franchises through February 1997.

24. From February 1997 until the date hereof, there is no mechanism in place for an entity to apply for a franchise for the operation of PPTs on the City's public rights-of-way.

25. There currently is no mechanism in place for an entity to apply for a franchise for the operation of PPTs on the City's public rights-of-way.

26. On September 17, 2003, the City Council of New York adopted a new Resolution, No. 1043, authorizing DoITT to issue franchises for the provision of telecommunications services via PPTs.

27. That Resolution provides,

> WHEREAS, there is the need to promote and sustain competition in the public pay telephone industry in the City; and
>
> WHEREAS, the Council has determined that the granting of such franchises will promote the public interest, enhance the health, welfare and safety of the public and will stimulate commerce by assuring the widespread availability of reliable public pay telephone service: . . .

28. Resolution No. 1043 provides that "[p]rior to the grant of such a franchise, a Request for Proposals ('RFP') or other solicitation shall be issued by [DoITT]."

29. DoITT is authorized and directed to make franchise available pursuant to Resolution No. 1043 for five years, i.e., until September 17, 2008.

30. Notwithstanding the direction of the City Council that it do so, DoITT has not issued a Request for Proposals ("RFP") pursuant to Resolution No. 1043.  An RFP sets forth the minimum and mandatory terms of any franchise to be granted for the provision of telecommunications services via public pay telephones, and applications for new franchises cannot be made until an RFP is issued.

31. Because of the non-issuance of a new RFP notwithstanding that the City Council authorized one in September 2003, no entity could today even apply for, much less receive, a franchise or permit to provide telecommunications services via a PPT in the City of New York.

32. As a result, the City and DoITT impose an absolute prohibition on the provision of telecommunications services via public pay telephone by any entity not granted a franchise before March 25, 2002.

33. Hanft was not granted a franchise before March 25, 2002.

### The Market For Public Pay Telephone Services & Congress' Intent To Allow Unfettered Competition

34.  Public payphones were operated as a monopoly under AT&T Corporation as it existed before the breakup of AT&T through the Modification of Final Judgment ("MFJ") plan

of reorganization in *United States v. Western Elec. Co.*, 569 F. Supp. 1057, 1102 n.195 (D.D.C. 1983), *aff'd sub nom. California v. United States*, 464 U.S. 1013 (1983). The MFJ directed that the payphone monopoly would be part of the local exchange services provided by the so-called "Baby Bells" or Regional Bell Operating Companies ("RBOCs"), the regional Local Exchange Companies created as part of the AT&T breakup. *Id.*; see also *Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, Notice of Proposed Rulemaking in CC Docket No. 96-128, 11 F.C.C.R. 6716, 6718-20 at ¶¶ 1-6, 1996 FCC LEXIS 3008 (June 6, 1996) (brief history of public pay telephones) ("FCC Notice"). In New York City, the sole provider of PPTs was Verizon, then known as New York Telephone, an operating subsidiary of AT&T that became part of NYNEX upon the AT&T divestiture under the MFJ.

35. Shortly after the breakup of AT&T, developments in PPT technology and a perceived market demand led "a number of independent or 'competitive' payphone owners . . . to compete with the LECs for the provision of payphone service." *FCC Notice*, 11 F.C.C.R. at 6720 at ¶ 6. Competitive PPT operators began to operate in New York City as well. Difficulties in obtaining the cooperation of both Verizon (which was needed to obtain a dial tone connection for the phone) and the City of New York hampered the development of these potential competitors for years.

36. The City began to regulate these new payphone providers in 1995. But in 1996, Congress passed the Telecommunications Act of 1996. The Telecom Act includes section 276, which expressly deals with PPTs. As the FCC observed:

> The Telecommunications Act of 1996 fundamentally changes telecommunications regulation. The 1996 Act erects a "pro-competitive deregulatory national framework designed to accelerate rapid private sector deployment of advanced telecommunications and information technologies and services to all

>Americans by opening all telecommunications markets to competition." In this proceeding we advance the twin goals of Section 276 of the Act of "promoting competition among payphone service providers and promoting the widespread deployment of payphone services to the benefit of the general public." To this end, we seek to eliminate those regulatory constraints that inhibit the ability both to enter and exit the payphone marketplace, and to compete for the right to provide services to customers through payphones.

*Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996, Report and Order*, 11 F.C.C.R. 20541, 20544 ¶ 2, 1996 FCC LEXIS 5261 (1996) (subsequent history omitted) ("*FCC Report*") (quoting S. CONF. REP. No. 104-230, 104th Cong., 2d Sess. 1 (1996)). *See also FCC Report*, 11 F.C.C.R. at 20547-20551 ¶¶ 11-18 (describing market conditions for competitive PPT services).

>37. In its payphone proceeding, the FCC further explained that:

>>Congress has directed us to take certain actions to effectuate its goals in the payphone area including the removal of subsidy schemes, providing for non-discriminatory access to bottleneck facilities, ensuring fair compensation for all calls from payphones, and allowing all competitors equal opportunity to compete for essential aspects of the payphone business. In general, we believe that vigorous and unfettered competition is the best way of achieving Congress' dual objectives. Unfortunately, various barriers – regulatory, structural, economic, and technological – stand in the way of having a fully competitive market providing payphone services. . . . . Regulatory restrictions on the placement of payphones, and existing subsidies from other telecommunication services available to certain competitors but not others are also examples of regulatory inefficiencies affecting competition and the widespread deployment of payphones.

*FCC Report* ¶ 3.

>38. The FCC recognized that states were part of the problem:

>To the extent that they exist, removing entry and exit restrictions placed upon the provisioning of payphone services will also take time because it requires action by the states. During the interim period before subsidies for LEC payphones are terminated and per-call compensation becomes effective, the states should examine and remove those regulations that affect the ability of PSPs [Payphone Service Providers] to freely enter and exit this business.

*FCC Report* ¶ 5.

8

39. The FCC concluded:

Our ultimate goal is to have a competitive payphone industry that meets the needs of the public by a wide deployment of payphones. In our view, we can best facilitate this by putting in place rules and regulations that provide incentives to all the players in the industry to eliminate, as soon as possible, all of the market distorting factors that exist today.

*FCC Report* ¶ 8.

40. In describing "The Payphone Marketplace," the FCC said:

   11. According to the record in this proceeding, the payphone industry has the potential to be very competitive. Entry into the payphone business appears to be easy. The ability to purchase a payphone, secure a location contract, obtain a payphone line from the LEC, and maintain the payphone are, together, the minimal technical requirements to enter into the payphone business. In addition, payphone lines are part of the tariffed offerings of local exchange carriers and, in some jurisdictions, only a simple business line is required to the payphone service. As contracts come up for renewal, or as location providers find it economical to put in new payphones, PSPs and interexchange carriers ("IXCs") routinely make themselves available to negotiate new agreements among themselves and the location provider. . . .

   12. A payphone can be removed and used at another location, which facilitates entry and exit. If a PSP can easily redeploy its assets, it will be more willing to place a payphone in response to a small increase in price, because the risk of such placement is lower. In addition, there appear to be no significant scale or scope economies or network externalities that would impede entry of new firms. As a result, barriers to entry appear to be very low. In fact a large number of firms, both large and small, have entered the industry since it was initially opened to competition in 1984, and those firms have provided competition in at least some segments of the payphone market.

   *13. The competition we observe today, however, has been significantly distorted by government regulation of prices, regulatory barriers to entry and exit, as well as by significant subsidies from other telecommunications services. . . . Removing these types of entry and exit restrictions is a necessary step toward allowing competitive forces to guide both the deployment of payphones and the setting of prices for payphone services.*

*FCC Report* ¶¶ 11-13 (emphasis added).

41. To effectuate these observations, twelve years ago the FCC adopted a rule: "Each state must review and remove any of its regulations applicable to payphones and payphone

9

service providers that impose market entry or exit requirements." 47 C.F.R. § 64.1330(a) (promulgated Oct. 7, 1996).

42. Thus, both Congress and the FCC directed that the PPT-monopoly enjoyed by the Baby Bells be replaced with open competition and directed that states and their subdivisions, including the City, to eradicate regulatory barriers that prevent that competition and "remove" barriers to "market entry or exit."

43. Apart from the specific payphone deregulation required by section 276 of the Act, in section 253 Congress outlawed any "State or local statute, other State or local legal requirement [that] may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." 47 U.S.C. § 253(a). This broad preemption of "legal requirements" applies equally to payphone services as to other telecommunications services.

44. Thus, in two separate provisions, Congress has in the Telecom Act directed that local governments, such as Defendants, not prohibit competition in the market for payphone services and remove barriers inhibiting such competition.

45. Notwithstanding these directives, Defendants have erected an absolute barrier to entry in the market and thus a barrier to the free exit from the market by Global.

**AS AND FOR A FIRST CLAIM FOR RELIEF
(Violation of 47 U.S.C. § 253 –
<u>The Non-Availability of Franchises</u>)**

46. Plaintiff hereby incorporates by reference paragraphs 1 through 45 above as if fully set forth herein.

47. The Telecommunications Act of 1996 prohibits state and local authorities from enacting rules, regulations, or requirements that prohibit or have the effect of prohibiting any entity

from providing telecommunications services or preventing any entity from being able to leave the market for the provision of such services.  47 U.S.C. § 253(a).

48. Without regard to the legality under section 253 of the particular requirements that would be imposed by Defendants should they make a franchise available to market entrants, the failure to make a franchise available to potential market entrants constitutes an illegal barrier to entry into the market for the provision of public payphone telecommunications services in the City in violation of 47 U.S.C. § 253(a).

**AS AND FOR A SECOND CLAIM FOR RELIEF**
**(Preemption By 47 U.S.C. § 276 –**
**The Non-Availability of Franchises)**

49. Plaintiff hereby incorporates by reference paragraphs 1 through 48 as if fully set forth herein.

50. Under the Communications Act (of which the Telecom Act is a part), the FCC is directed to enact regulations governing and preserving the payphone industry so as to "promote the widespread deployment of payphone services to the benefit of the general public."  47 U.S.C. § 276(b)(1).

51. The Communications Act further provides that: "To the extent that any state requirements are inconsistent with the Commission's regulations, the Commission's regulations on such matters shall preempt such State requirements."  47 U.S.C. § 276(c)

52. On September 20, 1996, pursuant to section 276, the FCC issued the *FCC Report*.

53. The *FCC Report* constitutes a comprehensive analysis and regulation of the entire payphone industry, including, *inter alia,* a prohibition against States and their political subdivisions from enacting any regulations that have the effect of placing barriers and/or obstacles to competition in the payphone industry.

54. Pursuant to its statutory mandate in section 276, the FCC adopted 47 C.F.R. § 64.1330(a), which provides that: "Each state must review and remove any of its regulations applicable to payphones and payphone service providers that impose market entry or exit requirements."

55. In adopting this rule, the FCC explained that "Our ultimate goal is to have a competitive payphone industry that meets the needs of the public by a wide deployment of payphones. In our view, we can best facilitate this by putting in place rules and regulations that provide incentives to all the players in the industry to eliminate, as soon as possible, all of the market distorting factors that exist today." *FCC Report* ¶ 8.

56. The *FCC Report* further explained that "The competition we observe today, however, has been significantly distorted by government regulation of prices, regulatory barriers to entry and exit, as well as by significant subsidies from other telecommunications services. . . . Moreover, some states currently prohibit the provision of payphone service by an entity other than the incumbent LEC. Removing these types of entry and exit restrictions is a necessary step toward allowing competitive forces to guide both the deployment of payphones and the setting of prices for payphone services." *FCC Report* ¶ 13.

57. The failure by Defendants to make a franchise available to new firms seeking to enter the public payphone business in the City, including Hanft, is inconsistent with and prevents the fulfillment of the regulations promulgated by the FCC.

58. As such, the City's actions are preempted under 47 U.S.C. § 276(c) and by Federal law and the Supremacy Clause of the United States Constitution, U.S. Const. Art. 6, Cl. 2.

**AS AND FOR A THIRD CLAIM FOR RELIEF**

**(Violation of 42 U.S.C. § 1983 –
Deprivation of Rights, as Protected By
The Constitution and Laws of the United States)**

59. Plaintiff hereby incorporates by reference paragraphs 1 through 58 as if fully set forth herein.

60. 47 U.S.C. § 1983 prohibits any State from depriving any citizen of the United States of any of the "rights, privileges, or immunities secured by the Constitution and laws" of the United States.

61. The failure by Defendants to permit Hanft, as an acquirer of the Global PPTs, to obtain a franchise to operate those PPTs violates Global's rights under the United States Constitution (procedural and substantive due process, First Amendment) and violates Global's rights under 47 U.S.C. §§ 253 and 276, and the FCC regulations promulgated pursuant thereto, and therefore, the actions of Defendants violate Section 1983.

62. The failure by Defendants to make a new franchise available in violation of federal law represents deliberate choices, and implement and/or execute a municipal policy or practice adopted by the City.

63. Defendants' actions are taken under color of state statute, ordinance, regulation, custom, or usage.

64. Defendants' failure to make a new franchise available in violation of federal law is causing and will cause Global both monetary and irreparable harm, including damage to Global's business, the threatened termination of its ability to operate public pay telephones in the City of New York. Therefore Defendants' actions violate 42 U.S.C. § 1983, entitling Global to monetary damages, attorneys' fees, and/or injunctive relief as provided under 42 U.S.C. §§ 1983, 1988.

**WHEREFORE**, Plaintiff respectfully request that the Court:

(i) Declare that Defendants' failure to make a franchise available for the operation of PPTs on the public rights-of-way in the City of New York violates 47 U.S.C. § 253;

(ii) Declare that Defendants' failure to make a franchise available for the operation of PPTs on the public rights-of-way in the City of New York violates 47 U.S.C. § 276 and the FCC regulations promulgated pursuant thereto;

(iii) Declare that Defendants have deprived Plaintiff of its rights under the Constitution and laws of the United States in violation of 42 U.S.C. § 1983;

(iv) Enjoin Defendants from removing Global's public pay telephones from their existing locations;

(v) Order Defendants to grant a franchise to Hanft for the operation of PPTs on the public rights-of-way in the City of New York, subject only to the terms and conditions that the City may lawfully impose under state and federal law;

(vi) Award Global damages in an amount to be determined in compensation for the injury and loss suffered as a result of Defendants' actions;

(vii) Direct Defendants to otherwise comply with all provisions of the Communications Act;

(viii) Award Plaintiff damages, costs and reasonable attorney's fees in accordance with 42 U.S.C. §§ 1983, 1988(b);

   (ix) Grant Plaintiff such other relief as is just and equitable.

Dated:  December 12, 2007

              LAW OFFICE OF JOSEPH P. GARLAND


              By: _____
                Joseph P. Garland (JG-0888)
              275 Madison Avenue, Suite 420
              New York New York 10016
              212-213-1812